# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

<u>**IN RE:**</u>

**JAMES LOGAN McMILLIN,**   Bk Case No: 8:05-bk-27381-KRM
                           Adversary No: 8:07-ap-448-KRM

    Debtor.

_____/

**ANGELA STATHOPOULOS**

    Plaintiff/Appellant,

v.                           Case No.  8:10-cv-1036-T-JSM

**DAN ALFORD,**

    Defendant/Appellee.

_____/

## <u>ORDER</u>

This is an appeal from a final judgment of the Bankruptcy Court denying declaratory relief and dismissing certain counts of the complaint as to the Appellee Dan Alford.  This Court has jurisdiction pursuant to 28 U.S.C. § 158 (2004).  After considering the briefs of the parties, and hearing oral argument on February 4, 2011, the Court determines that the final judgment of the Bankruptcy Court should be affirmed.

## <u>STANDARD OF REVIEW</u>

This Court reviews the Bankruptcy Court's factual findings under a clearly erroneous standard and the Bankruptcy Court's conclusions of law *de novo*.

## BACKGROUND

This Chapter 7 case was commenced in October 2005. James McMillin (the "Debtor") had previously filed for bankruptcy protection in 1990 and 2003. The 2003 and 2005 bankruptcy schedules and statement of financial affairs were nearly identical. But in the intervening years between the two filings, the Debtor had control of more than 1.3 million of revenues that ran through an entity called Virtual Trading Group, Inc. ("VT").

In 2002, Thomas Czerwinski, a long-time friend of the Debtor, formed VT. The Debtor was never an officer, director, or shareholder of VT, but Czerwinski, the sole shareholder, let the Debtor run VT as a general manager. From 2002, until it was dissolved by Czerwinski in 2008, Czerwinski had only minimal involvement with VT, and had no real knowledge or control over VT's business, its revenues, its checkbooks, or its disbursement of funds. The Debtor, however, controlled VT's checkbooks and caused hundreds of thousands of dollars of sales commission income to move through VT, which funds were then used to pay the Debtor's personal expenses.

There was one transaction at the center of the bankruptcy proceeding that formed the basis of the Trustee's claims that Defendants Dan Alford and Southeastern General ("SEG") were liable to the estate for receiving a fraudulent transfer. Specifically, less than a year before the Debtor filed this Chapter 7 case, on December 10, 2004, $282,000 was wired to VT by a non-affiliate of VT called Bluewater Trading, Inc. ("BWT"). It is undisputed that $2,000 of that wire transfer was commission income and was not really in dispute.

BWT is a Georgia corporation solely owned by Alford. BWT partnered with the Debtor and VT in many transactions in the products-trading business and paid VT commissions for services performed. Approximately $1,000,000 was transferred from BWT to VT from 2003 through 2007. VT reported commission revenues of $698,488 and $628,725 for 2004 and 2005, respectively.

SEG was formed in 1992 and was in the business of constructing homes. Its controlling shareholder and officer was Carl McCain. Alford was neither a shareholder nor officer of SEG, but he did frequently loan money to SEG and, by agreement, had the right to receive 50 percent of the company's annual profit. During the pendency of the Trustee's adversary proceeding, McCain shut down SEG and now conducts the same business through a new entity.

On December 10, 2004, BWT wire transferred $282,000 to VT's bank account. The wire transfer was a common method by which BWT paid commissions to VT. That same day, just hours after BWT's transfer to VT, Alford accompanied the Debtor to a Bank of America branch and the Debtor purchased for VT a $280,000 cashier's check payable to SEG, which had constructed a single family home in Ball Ground, Georgia. Alford hand-delivered the cashier's check to SEG.

The home in Ball Ground, Georgia (the "Ball Ground Property"), was at the time encumbered by a $230,000 construction loan mortgage held by Flag Bank, the construction lender. Prior to December 2004 and during the course of these proceedings, the Debtor resided in the Ball Ground Property.

The parties disputed two documents that allegedly related to the $280,000 transfer from VT to SEG. The first of these, dated December 8, 2004, purported to be signed by Alford and Czerwinski on behalf of VT. It provided in one paragraph that, "Dan Alford agrees to lend Virtual Trading Group, Inc. $280,000 for the right to purchase [the Ball Ground Property]. Title to said property will be titled in Dan Alford's name and will not be titled in Virtual Trading Group, Inc.'s name until Dan Alford has been paid in full. If within 60 days from this date, the above $280,000 has not been repaid in full, Virtual Trading Group, Inc. forfeits any and all rights to said property."

The second document, dated December 10, 2004, the same day as the delivery of the wire transfer and the cashier's check to SEG, purported to be a purchase and sale agreement between SEG and Alford. This document provided, "In consideration for $280,000 received by Southeastern General, Inc., Southeastern General Inc. sells [the Ball Ground Property] to Dan B. Alford. Southeastern General, Inc. agrees to sign a quitclaim deed in favor of Dan B. Alford or anyone he may designate when requested by Dan B. Alford."

Subsequent to December 10, 2004, SEG used a portion of the $280,000 to extinguish Flag Bank's $230,000 mortgage lien on the property. Alford, as personal guarantor, was released from liability for this loan. Under his lending relationship with SEG, Alford was entitled to one-half of SEG's profits for 2004.

The Debtor filed his bankruptcy petition on October 13, 2005. The Debtor did not disclose his residency in the Ball Ground Property or his relationship to VT. The Trustee's complaint included actions for denial of the discharge of the Debtor, accounting, declaratory

judgment, and avoidance of the alleged fraudulent transfer. In the complaint, the trustee stated she sought to avoid transfers to VT, Donna Mac, Donna McMillin, and their subsequent transferees. The complaint was vague as it related to Alford.[1]

Post-petition, and with knowledge of the Debtor's bankruptcy filing, SEG, at Alford's direction, issued a quit-claim deed of the Ball Ground Property to Alford, which was now unencumbered. No consideration was exchanged between SEG and Alford for the transfer.

VT did not receive anything in return for its transfer of $280,000 to SEG. The Trustee maintained that VT had an equitable interest in and should have received a deed to the Ball Ground property, which was ultimately transferred by SEG to Alford on March 1, 2006, approximately five months after the Debtor's Chapter 7 case was filed.[2]

Czerwinski testified during the proceeding that the purpose of the $280,000 transfer from BWT to VT was to purchase the Ball Ground Property for the Debtor. There was also evidence presented during the proceeding that Alford told a representative of his bank that the $280,000 transfer was for commissions owed to VT.

Alford, however, maintained during the proceeding that the December 10, 2004 wire transfer was a loan or option to VT to acquire the Ball Ground Property and when the debt to him was not repaid, Alford took the property in satisfaction of that debt.

---

[1] The complaint's vagueness as to Alford is concerning to this Court. However, based on the parties' conduct, the Court concludes that any issue related to the sufficiency of the pleadings as to Alford is waived at this point.

[2] Alford later sold the house in October 2006 to Terry Ferrero, who is not a Defendant in this case, for just under $205,000.

The Trustee's position was that the $280,000 represented commissions from BWT to VT. The Trustee conducted depositions of Alford and BWT and attempted to determine how BWT accounted for the transaction in its books and on its tax returns. Alford and BWT failed to produce documents detailing the commissions paid during 2004, so this issue remained unresolved.

The Bankruptcy Court concluded that VT was the Debtor's alter ego. The Bankruptcy Court also concluded, (without issuing a finding on the characterization of the December 10, 2004 transfer of $280,000 from BWT to VT), that there was insufficient proof that VT and the Debtor had control over the disposition of the $280,000 transferred to SEG on December 10, 2004. The Bankruptcy Court focused on the fact that the money was only in VT's account for a few hours and was redirected to SEG at Alford's direction, i.e., the Debtor did not have free use of the $280,000.

The Bankruptcy Court also concluded that even assuming, *arguendo*, the $280,000 was in VT/the Debtor's control, the Trustee failed to prove the insolvency of the Debtor at the time of the December 10, 2004 transfer. Finally, the Bankruptcy Court concluded that the Ball Ground Property was never property of the estate.

Notably, the Bankruptcy Court avoided the transfer by VT to SEG, because SEG defaulted this claim by not contesting the Trustee's lawsuit.[3] But the Bankruptcy Court did

---

[3] Default judgments were also entered against other Defendants who chose not to appear, defend, or otherwise put on evidence at trial.

not allow the default against SEG to establish facts which the Trustee could assert as binding against Alford. Accordingly, the Bankruptcy Court dismissed the claims against Alford.

## **DISCUSSION**

The Trustee argues that the Bankruptcy Court erred when it failed to determine the character of the $280,000 transfer from BWT to VT and concluded that the money was never in VT or the Debtor's control. The Trustee also argues that the Bankruptcy Court erred in allowing Alford to assert defenses beyond the statutorily prescribed defenses of §550.

The Court concludes that the Bankruptcy Court did commit error when it concluded that the $280,000 transfer was not within VT or the Debtor's control. However, the Court concludes that the Bankruptcy Court's finding that the Trustee did not establish insolvency at the time of the transfer was not clearly erroneous.

As an initial point, the Court concludes that Alford was not limited to raising only the defenses in 11 U.S.C. §550 of a mediate transferree. Although this is the general rule, this rule is not strictly applied when the underlying transfer was avoided by virtue of a default judgment. Here, the transfer from VT to SEG was avoided because SEG failed to contest the Trustee's claims. Under these circumstances, Alford can attack the underlying elements of the fraudulent transfer under 11 U.S.C. §§544, 548, or 549. *See In re AVI, Inc.*, 389 B.R. 721, 735 (9th Cir. 2008). In, *Dye v. Sachs (In re Flashcom, Inc.),* 361 B.R. 519 (Bankr. C.D. Cal. 2007), the trustee settled with the debtor's principal, who stipulated that the transfer was avoidable as a preference. At issue was whether the stipulation, which avoided the transfer, precluded the non-settling subsequent transferees from raising defenses to the avoidability

of the transfer as a preference.  The bankruptcy court concluded that the transferees had a constitutional right to defend the preference claim before they could be deprived of their property.  The court opined that if the rule were otherwise, trustees could negotiate settlements that could later be leveraged into recoveries against other defendants.  *Id.* at 525 n. 7.  *See also Thompson v. Jonovich (In re Food & Fibre Prot., Ltd.),* 168 B.R. 408, 416 (Bankr. D. Ariz. 1994) (trustee who obtained a default judgment against the initial transferee was required to prove every element of preference or fraudulent transfer against the subsequent transferee and not just that subsequent transferee was a transferee against whom recovery was appropriate).

Regarding the issue of control, the Court concludes that the Bankruptcy Court's finding that neither VT nor the Debtor had control of the $280,000 when it was transferred from BWT to VT and placed in VT's bank account was clearly erroneous.

In this circuit, courts "must look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether property is "property of the debtor" for fraudulent transfer purposes.  *Nordberg v. Sanchez (In re Chase & Sanborn Corp.*), 813 F.2d 1177, 1181-82 (11th Cir. 1987).  The dispositive question is whether the Debtor had *control* over the subject funds.  *Id.*  Application of the "control" test, as adopted in this circuit, "simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."  *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.*), 848 F.2d 1196, 1199 (11th Cir.1988).  Also, the law is clear

that funds in a debtor's account are presumed to be the debtor's property. *In re International Pharmacy & Discount II, Inc.*, 443 F.3d 767, 771 (11th Cir. 2005).

Because the Bankruptcy Court found that VT was the alter ego of the Debtor, it naturally follows that the $280,000 transfer to VT was tantamount to a transfer to the Debtor. The Bankruptcy Court focused on the facts that the funds originally came from BWT and were only in VT/the Debtor's possession for a matter of hours. The Bankruptcy Court also concluded that the funds were transferred to SEG at Alford's direction, because he accompanied the Debtor to the bank.

These facts, however, are insufficient to overcome the presumption of control, given the placement of the funds in VT's bank account combined with the evidence indicating that the money was for commissions owed to VT or for a loan to VT. Alford relies heavily on *In re Chase & Sanborn*, 813 F.2d 1177, to argue that VT/the Debtor did not have control of the funds. However, that case is distinguishable because the "debtor corporation, already defunct, had been reopened just for the purpose of laundering the [subject] funds." *See Societe Generale/Chase & Sanborn,* 848 F.2d at 1199. Here, VT was certainly not defunct at the time of transfer. And VT had received numerous transfers, representing commission payments, from BWT in the past for services performed.

Thus, the Court cannot affirm the Bankruptcy's ruling to the extent that it found a lack of control over the $280,000 of the $282,000 payment from BWT to VT. But the Court must affirm the Bankruptcy's finding that the Trustee failed to establish insolvency on the date of transfer. This finding was not clearly erroneous given the lack of evidence in the record as

to VT and the Debtor's insolvency on December 10, 2004. Indeed, there was evidence suggesting that VT was a very profitable business during the relevant time. And as the alter ego of the Debtor, the solvency of VT would transfer to the Debtor.

Finally, the Bankruptcy's finding that neither the Debtor nor VT had an equitable interest in the Ball Ground Property was not clearly erroneous. Although this Court may have concluded otherwise, it cannot say that the Bankruptcy Court was clearly erroneous when it concluded that there was insufficient evidence to establish the Debtor or VT's ownership interest in the property.

It is therefore ORDERED AND ADJUDGED that:

1. The final judgment of the Bankruptcy Court is AFFIRMED.

2. The Clerk is directed to enter Judgment in favor of Appellee and close this case.

**DONE** and **ORDERED** in Tampa, Florida on February 10, 2011.

/s/ James S. Moody, Jr.
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record
Clerk of U. S. Bankruptcy Court

S:\Even\2010\10-cv-1036.bankappeal.frm